NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| J&P INTERNATIONAL ENTERPRISE, INC. | : : : | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | : : | **OPINION** |
| v. | : : : | Civil Action No. 09-CV-0461 (DMC-JAD) |
| CANCER TREATMENT SERVICES INTERNATIONAL, L.P. | : : : | |
| Defendant. | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendant Cancer Treatment Services International, L.P. ("Defendant" or "CTSI") for an entry of summary judgment against Plaintiff J&P International Enterprise, Inc. ("Plaintiff" or "J&P") in accordance with Fed. R. Civ. P. 56. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1332(c)(1). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After carefully considering all submissions, it is the decision of this Court that Defendant's motion is **granted**.

## I.    **BACKGROUND**[1]

John K. Tse is the President and sole shareholder of J&P, a New Jersey corporation "engaged in the business of providing consulting services to business desirous of establishing relationships

---

[1]

The Facts in the Background have been adopted from the parties' respective submissions.

with corporations, organizations, and other entities located within the People's Republic of China."
Plaintiff's Complaint ("Pl. Compl."), ¶ 2. Joseph A. Nicholas is the President and CEO of CTSI, a
Delaware limited partnership comprised of a "group of physicians and businessmen experienced in
the development, operation and networking of cancer services on a national and international level,
intent on building and operating a large network of integrated cancer treatment facilities in regions
where cancer treatment options are inadequate or non-existent." Pl. Compl.,¶ 3.

### A.    THE ORAL AGREEMENT

In the Fall of 2007, CTSI began researching possible expansion of its business into China.
In October 2007, Nicholas was introduced to Tse.  During their initial meeting, Tse told Nicholas
that he could introduce CTSI to people that may want to partner with CTSI in China.  It is undisputed
that during this meeting Tse made clear the main terms of his engagement, including: (1) a minimum
term of three to five years; (2) a monthly retainer of $15,000; (3) four trips to China at $20,000 per
trip; (4) $2,500 per day for extra services; and (5) a percentage of a joint venture profit, if any, earned
by CTSI (the "Main Terms"). See Affidavit of John Tse in Opposition to Defendant's Motion for
Summary Judgment ("Tse Aff."), ¶ 6. Following this initial meeting, on October 18, 2007 (the
"October 18th meeting"), Tse met with Nicholas and other CTSI representatives at CTSI's Pittsburgh
office to pitch his consulting expertise and relationships in China.  During that meeting, Tse again
presented the proposed Main Terms of his engagement and stated that he would prepare a proposal
for J&P's compensation.  In response to his pitch, CTSI representatives allegedly shook Tse's hand
and told him "we've got a deal," "you are my man," and "we depend on you to take us to China."
Tse. Aff., ¶ 6.  Nicholas asked Tse to put his terms for consultancy services in written form. Tse Aff.,
¶ 7.

**B.    THE PURPORTED AGREEMENT**

On October 25, 2007, Tse sent Nicholas an e-mail with an attached proposal titled "Agreement of Consultant Services Between Cancer Treatment Services International and J&P International Enterprise, Inc." (the "Purported Agreement") See Defendant's Brief in Support of its Motion for Summary Judgment ("Def. Br."), Ex. B at 63:9-23. The next day, Nicholas acknowledged receipt of the Purported Agreement and told Tse that he would review the proposal with his partners and would present a response to Tse.  The Purported Agreement included a signature line for both parties to sign, although they never did.  Additionally, the Purported Agreement included a choice-of-law clause designating New York State law as governing. See Tse Aff., Ex. A.

**C.    THE ACTUAL AGREEMENT**

After receipt of the Purported Agreement, Nicholas and Tse engaged in a series of e-mails in which they discussed the terms of an alternate agreement (the "Actual Agreement") to take place before agreeing to, and executing, the Purported Agreement.  In response to Tse's October 25th e-mail and Purported Agreement, Nicholas sent Tse an alternative proposal in an e-mail on November 5, 2007 stating, in relevant part:

> Johnny thanks for your proposal of October 25th.  I have reviewed the proposal with our team and would like to suggest a path that will allow us to consider a full implementation of this proposal.
>
> I believe there is a diligence period for both your company and mine that we must go through prior to signing any long term contract.  When you were in Pittsburgh you mentioned that you could introduce us to references in both New York and Washington DC.  We would like to take that next step.  After that, we would like to travel to China to meet with your top prospects for building a cancer center and determine if there is a real opportunity for CTSI.  Throughout this diligence period, we would cover your expenses for these trips and we would pay you a daily/weekly

consulting fee.  After this type of diligence we would then be in a position to sign a contract that would bind us to a longer term.

See Def. Br., Ex. I. On November 15, 2007, Nicholas sent another e-mail reiterating the terms of the alternate proposal, stating in relevant part:

> Johnny, this email will confirm our phone conversation on Tuesday. You would like to introduce us to the private hospital that you have lined up in China...We agreed that CTSI would pay your expenses for this trip and that if we enter into an agreement with the hospital we would then consider a longer term relationship.
>
> When I inquired about the due diligence and your offer to have us meet with the Chinese officials at the U.S. Embassy, you thought it would be more appropriate to wait until we have a potential deal in China and then you will make the introduction to us.

See id.  Tse responded to Nicholas' November 15, 2007 e-mail on November 17, 2007, stating, in relevant part:

> I am agreed with your suggestion:
>
> (1) J&P will introduce CTSI to the Chinese private hospitals in China.
> (2) CTSI will pay J&P all travel expenses in Lump Sum of USD $20,000 per China trip.
> (3) J&P will schedule CTSI to visit China on 1/27/200[8]² to 2/2/2008.
> (4) CTSI and J&P will continue to discuss the "Consultant Agreement."
>
> I hope we are understanding our position and we can begin to solidify dates and travel plans.

See Def. Br., Ex. J.  On November 26, 2007, Nicholas responded to Tse's November 17, 2007 e-mail, stating: "John, I left you a voicemail today to call me to arrange details." Id.³

---

2

In his original e-mail, Mr. Tse inadvertently stated the year as 2007, rather than 2008. The parties do not disagree that the date should have been 2008.

3

By letter dated January 21, 2010, counsel for Plaintiff posited that the November 5, 2007, November 15, 2007, November 17, 2007 and November 26, 2007 e-mails constituted a new agreement (the "Actual Agreement").  See

-4-

D.     THE CHINA TRIPS

Pursuant to the discussions and conversations between Nicholas and Tse, J&P began arranging a trip for CTSI representatives to travel to China to meet with representatives of private hospitals.  CTSI's first trip to China, which took place in January 2007, resulted in a Memorandum of Understanding ("MOU") to engage in negotiations for a joint venture, dated and signed February 5, 2008 between Nicholas for CTSI and Xing-Yang Zhou ("Zhou"), Chairman of Jiang Han Tumor Hospital (the "Hospital").  See Pl. Compl., Ex. C.  J&P then arranged for a second trip to China for CTSI representatives, which extended from April 18, 2008 to May 4, 2008.  According to the Complaint, this trip entailed visits to hospitals in Beijing and Wuhan.  Pl. Compl., ¶ 8.  During this trip, Nicholas sent a proposal for a joint venture agreement to Zhou dated May 2, 2008, in which he outlined how CTSI wished to partner with the Hospital.  See Pl. Compl., Ex. D.  Finally, from June 23, 2008 to July 3, 2008, representatives of CTSI again met with Zhou in China, to further discuss their plans of a joint venture.  After this third trip, however, Nicholas sent Tse an e-mail dated July 6, 2008, explaining that the project would not move further until Zhou and his team came to the U.S. to visit CTSI sites. See Pl. Compl., Ex. F.

E.     TERMINATION OF THE ACTUAL AGREEMENT

By September 2008, negotiations with the Hospital and CTSI began breaking down, in large part because of a delay in Zhou visiting the U.S.  Tse made several attempts to schedule a convenient date for Zhou to visit, but an agreement could not be met.  During this same time, CTSI and J&P's relationship began breaking down as well.  On September 30, 2008, Nicholas sent Tse an e-mail

---

Plaintiff's Response to Defendant's Local Rule 56.1 Statement at 10 - 11.  Furthermore, Plaintiff contends the Actual Agreement is governed by the laws of the State of New Jersey.

explaining, in relevant part:

> I can appreciate that you have stayed in contact with Chairman Zhou since my last
> trip there in June.  At that time I made it clear that we would not move forward with
> the [Joint Venture] until Chairman Zhou made a trip to our facilities in the U.S. Our
> position has not changed...I am reluctant to spend any more dollars–including your
> monthly fees–until we are convinced that Zhou understands exactly what our deal
> is....
>
> Finally, please stop spending the $11K/month on communication with [Zhou]. I
> realize you will have to communicate with them to coordinate the next visit but this
> should be a phone call or two.  So my expectation is that we may owe you under $1K
> per month until their visit.

<u>See</u> Pl. Br., Ex. N.   Thereafter, on October 5, 2008, Zhou sent Nicholas a letter indicating that as

a result of scheduling conflicts on the part of Nicholas, the parties would have to delay meeting, but

in the meantime to have attorneys for CTSI and the Hospital begin meeting and discussing the details

of the joint venture project. <u>See</u> Def. Br., Ex. O.  In response to this letter, Nicholas sent Tse the

following e-mail, stating in relevant part:

> John, remember you work for CTSI and me...I have been very clear that we are not
> spending another dime until they come here.  For you to let Zhou write a letter like
> this and suggest that the delay was caused by our side having a scheduling conflict
> and suggest we spend money on attorneys–and allow him to send it directly to []
> [CTSI representatives] is irresponsible on your part.  For all I know, John, you
> suggested he do this.  At the very least, if you didn't suggest it you should have
> consulted me before you translated it and had him send it.
>
> Let's get something straight–you work for CTSI and me–you do not work for Zhou.
> I told you last week by e-mail and phone that we will spend no more money on this
> effort–including your fees–until they visit.

<u>See</u> <u>id.</u> After Nicholas' e-mail, Tse contacted Nicholas by telephone and explained, "it [is] not

possible for me to exist on a consultancy fee reduced to no more than $1,000 per month, and such

a unilateral reduction was contrary to our agreement for consultancy services." Tse Aff. ¶ 37.

Following the call, CTSI terminated its relationship with J&P, and put an end to the joint venture

negotiations with Zhou.  In an e-mail dated October 14, 2008, Nicholas explained to Tse, in relevant part:

> The conversation today revolved around your fee.  I have always committed that if we do a deal in China that you were instrumental in we would sign a retainer contract with you.  Absent of a deal we would pay you hourly.  Furthermore, you work for CTSI and when we request you to spend fewer hours during this short, interim period, we expect you to follow our direction.

> We do not have a deal yet and I am convinced we will not get to an agreement since we cannot communicate clearly.  It is for that reason that I have decided to discontinue our relationship with you and cancel the visit of Chairman Zhou.  It is clear to me that if we reached an agreement with Chairman Zhou that most of the communication will have to go through you and I am not comfortable with the situation as it is.

See Tse. Aff., Ex. W.

As a consequence of the terminated relationship between CTSI and J&P, J&P filed suit in this Court on February 2, 2009, claiming losses totaling $2,176,200 from CTSI's alleged breach of contract.  On March 3, 2009, CTSI filed an Answer to Plaintiff's Complaint.  The discovery period for this matter concluded on January 28, 2010.  On February, 2, 2009, Defendant filed the instant motion for summary judgment of Plaintiff's Complaint.

## II.  __STANDARD OF REVIEW__

"A court reviewing a summary judgment motion must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." Gaston v. U.S. Postal Serv., 2009 U.S. App. LEXIS 5673 (3d Cir. 2009).  However, "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

-7-

"A party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). "[T]he burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Cartrett, 477 U.S. 317, 325 (1986). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c)." Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).

> When a motion for summary judgment is properly made and supported, [by contrast,] an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal citations omitted). Indeed, "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." See Schoch v. First Fid. Bancorp., 912 F.2d 654, 657 (3d Cir. 1990). Rule 56(e) permits "a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Id. (quoting Lujan v. National Wildlife Fed'n., 497 U.S. 871, 889 (1990)). "It is clear enough that unsworn statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are the unsupported allegations of the

pleadings." <u>Schoch</u>, 912 F.2d at 657.

III.   **DISCUSSION**

In the Complaint, J&P alleges that as a consequence of the unilateral termination and alleged breach by CTSI of the Purported Agreement, J&P sustained losses including: loss of retainer at $15,000 per month, for 36 months, totaling $540,000; trips to China, less expenses, totaling $81,000; and the estimated annual loss of the Profit Sharing Award based upon services at the Hospital for no less than three years, totaling $1,555,200. As a result, J&P demands judgment against CTSI in the amount of $2,176,200, together with interest and costs. Pl. Compl., ¶ ¶ 5, 22 - 24.

In response, CTSI moves for summary judgment on J&P's Complaint, arguing that the Complaint asserts a claim pursuant to the Purported Agreement in isolation, to the exclusion of the Actual Agreement. Further, J&P contends that both the Purported Agreement and Plaintiff's Complaint memorialize the fact that the governing law with respect to the dispute at hand is state that New York State Law, and in the absence of a signature, under New York State Law, the Purported Agreement is unenforceable.

J&P's opposition brief attempts to infuse a choice-of-law dilemma in an apparent effort to overcome the defects of its pleadings. Despite the explicit language in the Complaint asserting that New York State Law governs the instant matter, J&P now contends the parties entered into an enforceable agreement, albeit orally, during the October 18th meeting, in which Tse iterated the Main Terms of his engagement and CTSI allegedly orally accepted them. After performing its own choice-of-law analysis in its brief, J&P asserts New Jersey State Law should apply to this oral agreement. Furthermore, J&P posits that the Purported Agreement is immaterial to the enforceability of the

-9-

parties' obligations because it was merely a memorialization of the previously agreed upon Main Terms. Pl. Br., 12-16. Finally, J&P claims the November 5, 2007, November 15, 2007 and November 17, 2007 e-mail exchanges were conditions precedent to the acceptance of a long-term consultancy agreement, but do not affect the enforceability of the agreed upon Main Terms. See id. For the reasons set forth below, Defendant's motion for summary judgment is **granted**.

## A.    NEW YORK STATE LAW

In support of its underlying breach of contract claim, Plaintiff's Complaint pleads the existence of a contract between the parties based upon the Purported Agreement. Likewise, the Complaint asserts that the Purported Agreement is governed by New York State Law. The entirety of Plaintiff's pleadings as to the existence of an agreement between the parties is as follows:

> In consideration of J&P International's services, CTSI agreed to pay J&P International a retainer of $15,000 per month for a period of three years; in the event J&P International's services resulted in creation of any new Private Hospitals in which CTSI shall have a business interest, CTSI agreed to pay J&P International 10% of the profits made by CTSI; CTSI was required to pay all J&P International's out-of-pocket expenses; J&P International agreed to travel to China on four business trips per year. For services beyond the scope of services called for by the Agreement, CTSI was to pay $2,500 per day, plus out-of-pocket expenses, CTSI were to act in "good faith" in fulfilling the intentions of the Agreement, and the Agreement was governed and was to be construed in accordance with the laws of New York State.

Pl. Compl., ¶ 5. CTSI argues that under New York State Law, the absence of a signed agreement precludes its enforceability. Def. Br. at 15. The Court agrees.

Pursuant to New York General Obligations Law § 5-701:

> (a) **every agreement**, promise or undertaking **is void, unless** it or some note or memorandum thereof **be in writing, and subscribed by the party to be charged therewith**, or by his lawful agent, **if such agreement**, promise or undertaking:
>
> (10) **Is a contract to pay compensation for services rendered in negotiating** a

loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or **of a business opportunity**, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. **"Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction**.

(emphasis added).  In this case, it is undisputed that the parties attempted to enter into an agreement whereby J&P would provide services to CTSI by establishing relationships with entities in China for the purpose of procuring business opportunities.  In order to be an enforceable agreement under New York State Law, the parties were required to comply with General Obligations Law § 5-701, but failed to do so.  The Purported Agreement on which J&P bases its claim(s) was never signed by CTSI.  Even viewing the facts in a light most favorable to J&P, it cannot overcome this obstacle to enforceability.  Therefore, to the extent Plaintiff attempts to state a claim under New York State law, Plaintiff's Complaint is **dismissed**.

## B.   NEW JERSEY STATE LAW

As recited above, in its brief, J&P contends the parties entered into an oral agreement during the October 18th meeting.  J&P asserts that under New Jersey State Law this agreement must be enforced notwithstanding the failure to later execute a formal written contract.  Def. Br. at 12.  Despite Plaintiff's claim that a contract exists, it is undisputed that during the meeting, CTSI requested the proposed terms be presented a formal written agreement.  See Tse Aff., ¶ 7; Plaintiff's Response to Defendant's Local Rule 56.1 Statement ("Pl. 56.1 Resp."), ¶ 8.  The proper inquiry then, is whether the alleged oral agreement was a binding preliminary agreement or merely an agreement as to the general terms to be included in a written agreement, executed at a later time.

Under New Jersey State law, "[p]arties may or may not be bound by their preliminary

-11-

agreement when they contemplate that its terms will later be reduced to a formal written contract. Whether the preliminary agreement is binding is a matter of the parties' intent." Morales v. Santiago, 526 A.2d 266, 269 (N.J. Super. Ct. App. Div. 1987) (internal citations omitted). On the one hand, "[i]f the parties intend to be bound by their preliminary agreement and view the later written contract as merely a memorialization of their agreement, they are bound by the preliminary agreement.  On the other hand, if the parties intend their preliminary agreement to be subject to the terms of the later contract, they are not bound by their preliminary agreement." Id.; see also West v. IDT Corp., 2008 WL 762459, *4 (D.N.J. Mar. 19, 2008).  Moreover, "parties may orally, by informal memorandum, or by both agree upon all the essential terms of a contract and effectively bind themselves...even though they contemplate the execution later of a formal document to memorialize their undertaking...the ultimate question is one of intent." Comerata v. Chaumont, Inc., 145 A.2d 471, 475 (N.J.Super.Ct.App.Div. 1956).

In Aequus Tech., LLC v. GH, LLC, the Court dealt with a similar issue involving the existence of an alleged preliminary agreement under New Jersey State Law. 2009 WL 2526697 (D.N.J. Aug. 17, 2009).  In Aequus, the Court explained:

> To determine the parties' intent to be bound, courts have referred to a "number of elements in the evidential panorama underlying a factual finding of intent and enforceability." West v. IDT Co., 2008 WL762459 (D.N.J. Mar. 19, 2008) (quoting Berg Agency v. Sleepwood-Willingboro, 346 A.2d 419, 424 (N.J.Super.Ct.App.Div. 1975)). These elements include the "document itself and the underlying facts relating to the negotiations leading to its execution." Id. (internal citations omitted).  The Morales court further observed that "absence of essential terms from a preliminary agreement is persuasive evidence that the parties did not intend to be bound by it. Morales, 526 A.2d at 269.  In addition, courts have looked to whether performance that was agreed to by the parties was undertaken (West citing Comerata, 145 A.2d at 475), the prior dealings of the parties (Id. at *4), industry practice (Id. (citing Marilyn Manson, Inc. V. N.J. Sports & Exposition Auth., 971 F.Supp. 875, 889 (D.N.J. May 7, 1997))) and the nature and complexity of the transaction (Id. (citing

-12-

Surf & Turf Dev., LLC v. Cestone, 2006 WL 3025512, at *2 (N.J.Super.App.Div. Oct. 26, 2006))).

Id. at 7.

As in Aequus, here, J&P's evidence of the parties intent to be bound by the alleged oral agreement is insufficient. See 2009 WL 2526697, at *8. J&P's only evidence of CTSI's intent to be bound by any oral discussions is its own self-serving affidavit, in which Tse states that CTSI representatives allegedly told him: "we have a deal," "I shook your hand, everything is all right," and "...you have my word, the contract is signed." Tse Aff. ¶ 8.[4] This does not demonstrate the requisite meeting of the minds necessary to bind parties to an agreement. See Flanagan, et. al. v. Minnesota Corn Processors, Inc., et. al., 1997 U.S. Dist. LEXIS 24182 (D.N.J. Aug. 19, 1997) (finding insufficient evidence of an intention to be bound despite the fact defendant made statements indicating the parties agreed to a transaction); see also 2009 WL 2526697, at *8. In addition, the absence of essential terms with respect to the Main Terms proposal on which J&P bases its claim suggests a lack of intention to be bound by their oral discussions, particularly in the context of a potential long-term consultancy agreement to provide services in a foreign country. First, Tse explained that his arrangement would need to be "two or three years duration," but the parties never agreed on the finite duration during their October 18th meeting. See Def. Br. at 5; Tse Aff. at 4.[5]

---

[4]

CTSI does not dispute Tse's allegations. See Def. Reply. Therefore, the existence of an agreement between the parties is a question of law for the Court to decide. See West v. IDT Corp., 2008 WL 762459, *5 (D.N.J. Mar. 19, 2008) (explaining where the evidence is not conflicting, the existence of a contract is for the Judge to decide); see also American Lumber & Mfg. v. Atlantic Mill & Lumber Co., 290 F. 632, 634 (3d Cir. 1923); Elliot & Frantz, Inc. V. Ingersoll-Rand Co., 457 F.3d 312, 327 (3d Cir. 2006) (quoting Driscoll Constr. Co. v. Dep't of Transp., 853 A.2d 270 (N.J.Super.App.Div. 2004).

[5]

Tellingly, Tse stated in his affidavit that he told CTSI that his retainer would need to be for a duration of a "minimum of three to five years," while in its brief, J&P states Tse told CTSI it would need to be "two to three years." See id.

-13-

Second, Tse never presented a definitive number as to the percentage of profits he would be entitled

to share in, and the facts do not suggest it was ever contemplated by the parties during the October

18th meeting. Id.[6]

       Moreover, J&P failed to demonstrate that performance was undertaken in conformance with

the oral agreement.  In fact, before performance was even set to commence, J&P sent CTSI the

Purported Agreement, in written form as requested by CTSI.  Contrary to J&P's contention, CTSI

explicitly rejected the Purported Agreement in its November 5, 2007 e-mail, and instead, presented

a counter-offer as to J&P's consultancy services.  See Berberian v. Lynn, 809 A.2d 865, 869

(N.J.Super.App. Div. 2002) ("A counteroffer operates as a rejection because it implies that the

offeree will not consent to the terms of the original offer and will only enter into the transaction on

the terms stated in the counteroffer.").  J&P's November 17, 2007 e-mail in response operated as an

acceptance of CTSI's counter-offer as to the new terms of services (i.e., traveling to China and

finding a "real opportunity" **before considering** signing any consultancy agreement).  Indeed, Tse

even replied in his November 17th e-mail that "CTSI and J&P will continue to discuss the

'Consultant Agreement.'" See Tse Aff. Ex. D; see also Big M, Inc. v. Dryden Advisory Group, 2009

U.S. Dist. LEXIS 55423, *39 (D.N.J. June 30, 2009) (citing Weichert Co. Realtors v. Ryan, 608

A.2d 280, 284-85 (N.J. 1992) ("The acceptance fulfills the requirement of mutual assent...[t]o be

effective and create a binding contract, the acceptance must be absolute and match the terms of the

offer.").  Thus, any subsequent performance that was undertaken by the parties was subject to the

---

[6] A review of the facts reveals that in the Purported Agreement, J&P stated it would be entitled to 10% of profits earned,
if any, yet this percentage was not discussed during the October 18th meeting.

terms of CTSI's November 5th counter-offer and J&P's November 17th acceptance.[7]

Just as in <u>Aeequs</u>, the oral discussions on October 18, 2007 did not ripen into an enforceable, binding agreement under New Jersey State Law. See 2009 WL 2526697, at *9 (finding no agreement because "Plaintiffs fail to present the requisite evidence to demonstrate an intent to be bound, such as presence of all the essential terms, partial performance of the agreement...and [t]he limited evidence presented by Plaintiffs consists wholly of vague or self-serving statements that do not satisfy their burden of showing the parties intended to be bound by the negotiations at the July 2003 meeting.").[8]

To the extent Plaintiff attempts to plead a breach of contract claim under New Jersey State law, any purported agreement(s) is unenforceable and Plaintiff's Complaint is **dismissed**.

---

[7]

 Relying on <u>Pascarella v. Bruck</u>, 190 N.J.Super. 118, (N.J.Super.App.Div. 1983), J&P asserts that "where a party to an agreement-in-principle suddenly changes its mind, and refuses to execute a written contract without explanation, the court must enforce the agreement." Def. Br. at 13.  <u>Pascarella</u> is distinguishable.  First, the agreement at issue in <u>Pascarella</u> involved an agreement to settle, while the agreement in this case involves a long-term deal to provide consultancy services in another country.  New Jersey has a strong public policy favoring settlement of litigation, and is therefore more inclined to bind a party to an agreement, irrespective of "whether or not made in the presence of the court and even in the absence of a writing." <u>Id.</u> at 124.  There is no indication that courts in New Jersey are as willing to enforce all types of agreements-in-principle, and J&P has not presented any cases suggesting otherwise.  Second, even if the Court concluded the parties came to an enforceable agreement-in-principle (which it does not), CTSI did not refuse to execute a written contract.  Instead, CTSI presented an alternate proposal before considering to sign any consultancy agreement, and J&P voluntarily agreed to CTSI's suggestion.

[8]

 In fact, it appears the plaintiff in <u>Aequus</u> based its argument that the parties had a binding agreement on substantially more than the plaintiff here.  <u>Id.</u> at 8 (noting although Defendant testified that the parties sat down and reached an agreement on a piece of paper there was still insufficient evidence of an intent to be bound).

## IV.   **CONCLUSION**

For the reasons set forth in this Opinion, Defendant's motion for summary judgment is

**granted**.  An appropriate Order accompanies this Opinion.


                                        S Dennis M. Cavanaugh
                                        Dennis M. Cavanaugh, U.S.D.J.


Dated:        August   19  , 2010
Original:     Clerk
cc:           Hon. Joseph A. Dickson, U.S.M.J.
              All Counsel of Record
              File

-16-